# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| MAMAN BIO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:16-cv-02546-TWP-MJD |
| | ) |
| INVENTIV HEALTH CLINICAL, LLC, | ) |
| | ) |
| Defendant. | ) |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant inVentiv Health Clinical, LLC ("inVentiv") ([Filing No. 68](Filing No. 68)). Plaintiff Maman Bio ("Bio") filed this lawsuit after inVentiv terminated him from his management position with the company. Bio filed this action asserting claims for gender, race, and national origin discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), as well as a claim for retaliation. After answering the Complaint, inVentiv filed the instant Motion, asserting that Bio was terminated for legitimate business reasons, and there is no evidence of discrimination. For the following reasons, the Court **grants** inVentiv's Motion for Summary Judgment.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Bio as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

inVentiv is a health industry company that provides clinical, commercial, and consulting services to pharmaceutical, biotechnology, and life sciences companies. It enters into project-based contracts with pharmaceutical companies such as Eli Lilly and Company ("Lilly"), Bayer, and Pfizer. Under these contracts, teams of inVentiv employees provide statistical analysis staffing and services for discrete clinical research projects and other needs as defined by its clients ([Filing No. 70-1 at 2](Filing No. 70-1 at 2)).

Distinct groups within inVentiv provide contracted services to clients, including strategic resourcing, which serves early-stage clinical research ventures; Phase II–III, which serves clients in mid-stage phases of clinical trials; and late stage, which focuses on Phase IV studies of FDA-approved products ([Filing No. 70-2 at 6](Filing No. 70-2 at 6); [Filing No. 70-3 at 10](Filing No. 70-3 at 10)).

Bio is Black and was born in Niger, Africa. He began working for inVentiv in February 2010 as a senior statistical programmer. He was the only Black employee in the statistical programming group, and he was the only employee from Niger. Bio's duties as a senior statistical programmer were to provide programming work for inVentiv's clients. He performed his duties well, and his work evaluations were "meets expectations" or better ([Filing No. 74-1 at 3](Filing No. 74-1 at 3)).

In November 2012, Bio was promoted to the position of manager in the statistical programming group. After his promotion, Bio's supervisor was Steve Benjamin ("Benjamin"), the director of the group. Bio's duties as a manager of statistical programming were to assign programming projects to the programmers on his team, monitor those projects to ensure they were done properly, evaluate the performance of programmers on his team and audit their time entries to ensure they were properly billing and coding, tracking billing receipts, and consulting and communicating with inVentiv's clients regarding projects. *Id.* at 3–4.

Bio and his team provided services on statistical programming projects for Lilly ([Filing No. 70-1 at 3](#); [Filing No. 70-4 at 5](#)–7). The statistical programming managers in the Lilly group each supervised approximately ten statistical programmers ([Filing No. 70-1 at 3](#)). When Bio became a manager in November 2012, he was one of eleven managers. After February 2014, he was one of four managers. After February 2014, Bio no longer communicated and consulted with Lilly; instead, Aicha Bassile ("Bassile"), another manager, became the liaison with Lilly ([Filing No. 74-1 at 2](#), 4).

In March 2014, Lilly communicated to inVentiv that it was insourcing its oncology projects performed by inVentiv, which included the statistical programming work performed by Bio's team. inVentiv held a meeting with its managers to discuss its insourcing strategy. It also created a "frequently asked questions" document as a reference for managers when responding to questions from their team members about the insourcing. Bio attended the managers' meeting and received the follow-up communications about the Lilly insourcing. When the oncology projects were insourced by Lilly in March 2014, inVentiv's understanding was that only the oncology projects were being insourced; it believed that the other Lilly work would remain with inVentiv. In fact, the managers were informed that Lilly had renewed its contract with inVentiv for three more years. However, in late 2014 and early 2015, Lilly continued to insource additional statistical programming work ([Filing No. 70-1 at 4](#); [Filing No. 70-4 at 29](#)–30; [Filing No. 70-5 at 9](#)–12; [Filing No. 74-5 at 12](#)–13; [Filing No. 74-6 at 22](#)–34).

Around this same time, as part of inVentiv's reorganization efforts in response to Lilly's insourcing, Bio began reporting to Paul Slagle ("Slagle"), an associate director of statistical programing ([Filing No. 70-4 at 11](#)).

In November 2014, Bio complained to human resources that Slagle was improperly micromanaging him and his team. He sent an email explaining that he was going through a manager/employee situation that prevented him from doing his job properly, and the situation was getting worse. The situation involved the way Slagle was handling Bio's treatment and discipline of a team member who was Slagle's friend. Donna Elbert ("Elbert"), vice president of human resources, met with Bio to discuss his concern. He complained that Slagle was micromanaging him and his team. After the meeting, Elbert investigated Bio's complaint, but she could not find evidence to support the allegations of Slagle's micromanagement ([Filing No. 70-4 at 36](#)–40, 61–63; [Filing No. 70-6 at 2](#)–3).

In January 2015, Bio sent another email to Elbert explaining that his situation was not getting better. Elbert asked Katie Koers ("Koers"), a human resources manager, to meet with Bio and Slagle to discuss their situation. Koers met with Bio and Slagle in February 2015, and at the conclusion of the meeting, Koers believed the dispute had been resolved ([Filing No. 70-6 at 3](#), 14; [Filing No. 70-7 at 1](#)). However, the dispute was not resolved, and Bio took his complaints to inVentiv's CEO. ([Filing No. 74-1 at 7](#), ¶43.)

In late 2014 and early 2015, Bio provided Slagle the performance reviews and employee rankings for the members of his programming team, and Bio recommended promotions for some of his team members. Slagle reviewed Bio's proposed assessments and made some revisions. Bio disagreed with Slagle's revisions. On March 20, 2015, Bio sent an email to Gregg Dearhammer ("Dearhammer"), inVentiv's chief operating officer, and copied Elbert on the email. In the email, Bio explained generally his disagreement with Slagle's management of his team and more specifically the revisions Slagle made to Bio's employee assessments. Dearhammer responded the same day, thanking Bio for raising his concerns and informing him that Elbert and others would

4

evaluate his concerns. Bio's concern was referred to Tracy Mayer ("Mayer"), vice president of strategic resourcing, and Elbert. Mayer and Elbert investigated Bio's concerns and determined that Slagle was properly managing Bio's team and made appropriate revisions to Bio's evaluations and recommendations. On April 7, 2015, Mayer responded to Bio, informing him that the compensation ratings had been investigated and would not be changed (Filing No. 70-4 at 64–68; Filing No. 70-6 at 3–4, 6).

Bio's team initially had worked exclusively on programming projects for Lilly. However, beginning in September 2014, Bio's team did programming work for non-Lilly companies in addition to its work for Lilly. Slagle and Bio decided to "globalize" the programming work of Bio's team because of Lilly's insourcing. All the managers in the statistical programming group met on a weekly basis to discuss the projects they were working on and to see if any team in the group needed assistance. Bio's team began doing programming work for inVentiv's Phase II–III program, which was led by Nancy Fish, an associate director of statistical programing. Bio estimated that, by May 2015, his team was working on Lilly programming about 20% of the time, and about 80% of their time was spent on non-Lilly work (Filing No. 74-1 at 3–4).

As Bio's team completed statistical programming projects for Lilly, Lilly was not replacing those completed projects with new work. Bio knew that his team's statistical programming projects for Lilly were diminishing, so he was involved in keeping his team members busy on other teams' projects (Filing No. 70-2 at 5; Filing No. 70-4 at 33–35; Filing No. 70-5 at 4–5, 9–12). From April 2015 until July 2015, Bio was assigned as a manager exclusively to Lilly projects even though his team members were temporarily working on other projects (Filing No. 70-5 at 19).

Because the Lilly work to which Bio was assigned was coming to an end, in May 2015, Benjamin and Koers began efforts to find another management position at inVentiv for Bio by

5

using the company's redeployment tracker, an internal job placement tool. Bio remained in the redeployment tracker through June 2015, but no management positions were identified for him to fill. During this time, Benjamin asked other directors and managers to consider Bio's team members for permanent assignments. Benjamin frequently communicated to Bio that his team's programming work for Lilly was going to end, his team members would be available for other fulltime assignments in July 2015, and he needed to prioritize permanent placements over temporary assignments for his team members. Bio kept his team members busy with temporary assignments and told other managers/directors that his team members would not be available in July for permanent placements ([Filing No. 70-7 at 2](); [Filing No. 70-1 at 4]()–7, 10–29).

During May and June 2015, no management positions were identified in inVentiv's redeployment tracker for Bio. On July 2, 2015, Benjamin and Koers telephoned Bio and terminated his employment as a manager in its statistical programming group ([Filing No. 70-1 at 7]()–8; [Filing No. 70-4 at 71](); [Filing No. 70-7 at 1]()–2). Bio was told that because Lilly had insourced its programming work and there was no more work for Bio and his team, his position was being eliminated. *Id*. At the time of the telephone call, Bio sent an email to Dearhammer and Elbert, explaining, "This is just to let you know that I feel there is an ongoing retaliation against [me] for raising my hand regarding my situation with my previous manager Paul Slagle." ([Filing No. 70-4 at 69]().) Five minutes later, Bio sent a second email to Dearhammer and Elbert, stating, "I have just been terminated with iVC. Steve Benjamin and Katie Koers currently on a phone with me. This is the retaliation I just mentioned." *Id.*

By May 2015, Bio and his team did only about 20% of its programming work for Lilly; 80% of its work was for companies other than Lilly. ([Filing No. 74-1 at 4]().) At the time of his termination, Bio was still doing programming work for Lilly, there was more Lilly work for his

6

team and there was other work for his team because of the Phase II-III projects that his team was working on. *Id*. Bio, the only Black and only Nigerien employee, was the only employee terminated. On September 26, 2016, Bio filed a Complaint against inVentiv, asserting Title VII and Section 1981 claims for race, national origin, and gender discrimination as well as a claim for retaliation ([Filing No. 1](#)). inVentiv responded and then filed its Motion for Summary Judgment, asserting that Bio was terminated for legitimate, non-discriminatory reasons, and there is no evidence of discrimination.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Bio, as the non-moving party and draws all reasonable inferences in his favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

### III.　　DISCUSSION

inVentiv argues that it is entitled to summary judgment on each of Bio's claims because there is no evidence of discrimination or retaliation, and inVentiv terminated Bio's employment for legitimate, non-discriminatory reasons. The Court will address each of Bio's claims in turn.

**A.　Gender Discrimination Claim**

inVentiv asserts, "Bio originally claimed gender discrimination in violation of Title VII. (Dkt. 1, ¶ 58). Pursuant to his Statement of Claims, he is no longer pursuing this claim. (Dkt. 64). Bio's gender discrimination claim would fail for the same reasons as his remaining claims." (Filing No. 69 at 11, n.7.) Bio failed to respond to inVentiv's argument.

The Court agrees and Bio does not dispute that this claim is abandoned. It is well established that when a party fails to respond to an issue raised in a summary judgment motion or fails to raise his claim in the response brief, the issue or claim is deemed abandoned or waived. *Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003); *Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999). Indeed, in his Statement of Claims, Bio asserts only claims of race discrimination, national origin discrimination, and retaliation under Title VII and Section 1981 ([Filing No. 64](#)). Because Bio did not respond to inVentiv's argument and did not assert his gender discrimination claim in his Statement of Claims, summary judgment is **granted** on Bio's gender discrimination claim.

**B.** **Retaliation Claim**

inVentiv argues that Bio's retaliation claim must be dismissed on summary judgment because inVentiv did not retaliate against Bio for engaging in protected activity. To support a retaliation claim, a plaintiff must provide evidence that "(1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) a causal connection exists between the two." *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012).

"Title VII protects an employee from retaliation for complaining about the types of discrimination it prohibits." *Hamm v. Weyauwega Milk Prods.*, 332 F.3d 1058, 1066 (7th Cir. 2003) (citation and quotation marks omitted). Thus, to support the first element of a retaliation claim, the plaintiff must establish that "the complained-of conduct entailed a motive that Title VII prohibits." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). To constitute statutorily protected activity, an employee's complaint to their employer "must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. Merely complaining in general terms of discrimination or harassment, without indicating a

9

connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (internal citation omitted).

inVentiv argues that Bio's retaliation claim fails because he did not engage in statutorily protected activity when he complained about Slagle's micromanagement and Slagle's revisions to Bio's team employee reviews. inVentiv asserts that Bio's complaints included nothing about race, national origin, or gender discrimination nor any other information that would support an inference of such discrimination. Instead, Bio's complaints were simply disagreements about management styles and employee evaluations. In fact, Bio's emails to inVentiv on the day of his termination explicitly claimed that he was being retaliated against because of complaining about his situation with Slagle. As a result, inVentiv asserts, Bio did not engage in statutorily protected activity, so his retaliation claim must be dismissed.

Bio did not respond to inVentiv's argument regarding the retaliation claim. In its reply brief, inVentiv noted Bio's failure to respond: "Finally, the Court should grant inVentiv's Motion for Summary Judgment on Bio's retaliation claim because Bio wholly failed to respond in support of that claim." ([Filing No. 80 at 2](#).) Where a party fails to respond to an issue raised in a summary judgment motion, the issue or claim is deemed abandoned or waived. *Palmer*, 327 F.3d at 597–98.

The designated evidence shows that Bio complained only about management differences and disputes with Slagle without any complaints related to race, national origin, or other protected status. Thus, the evidence does not support the first element of a retaliation claim—the plaintiff engaged in protected activity. The case law and designated evidence cited by inVentiv supports its argument, and Bio did not respond to the argument. Accordingly, the Court **grants** summary judgment in favor of inVentiv on the retaliation claim.

10

C.  **Race and National Origin Discrimination Claims**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides,

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

42 U.S.C. § 1981.

"The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981." *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012). "[A]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) (citation omitted); *see also Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) ("We apply the same standards to Title VII and § 1981 discrimination and retaliation claims."); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007) ("we generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981"); *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 681–82 (7th Cir. 2001) ("we analyze § 1981 and Title VII discrimination claims in the same manner"). Each party presented their race and national origin arguments as a single argument rather than as two separate arguments for the two separate claims; therefore, the Court will likewise address Bio's Title VII and Section 1981 race and national origin discrimination claims together.

The issue in a discrimination case is whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's race, national origin, or other protected class caused the termination or other adverse employment action. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The evidence must be considered as a whole instead of asking whether any piece of evidence proves the claim by itself. *Id.*

Bio may make this showing by presenting evidence that: (1) he belongs to a protected class, (2) he met inVentiv's legitimate performance expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside his protected class received more favorable treatment. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). If Bio makes this showing, then inVentiv can defeat the claims by articulating a legitimate, non-discriminatory reason for the adverse employment action. Bio then may move forward with his claims only if he can demonstrate that inVentiv's proffered reason is pretextual—that is, a lie to hide discriminatory conduct. *Id.*; *see also Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006).

inVentiv does not dispute that Bio belongs to a protected class, he met inVentiv's legitimate performance expectations, and he suffered an adverse employment action when he was terminated. However, inVentiv argues that there are no similarly situated employees outside Bio's protected class who received better treatment, and it had a legitimate, non-discriminatory reason for terminating Bio—that is, Lilly insourced the work performed by Bio's team.

inVentiv argues that Bio cannot identify similarly situated employees who received more favorable treatment because the project-specific work that Bio and his team performed did not exist after July 2, 2015, and Benjamin and Bassile only temporarily absorbed Bio's team members until they left the company or were permanently placed on new teams. inVentiv explains,

> Unlike Bassile's team, or the team of any other purported comparator employee, Bio's work and team *did not exist* after July 2, 2015. The work they performed for

> Lilly was no longer provided by anyone at inVentiv. No one was favored over Bio to perform the work, because it went away completely. Although members of Bio's team remained employed by inVentiv, they began performing distinctly different work, in several cases, for different clients. Further, Benjamin is not similarly situated to Bio because he is a director, while Bio was a manager. Bassile is not similarly situated to Bio because she performed different work which was not as affected by Lilly's insourcing.

([Filing No. 69 at 13](#)–14 (internal citations omitted).)

As to its legitimate, non-discriminatory reason for terminating Bio, inVentiv explains it had a contract to perform statistical deliverable work for Lilly, and Bio's team was specifically designated to provide particular services to Lilly pursuant to that contract. When Lilly began to insource the work that Bio and his team performed, their jobs were in jeopardy. As the incoming Lilly work declined in late 2014 and early 2015, Benjamin and Koers attempted to identify new opportunities for Bio and his team. When the Lilly work specifically assigned to Bio's team concluded, Bio's team members were reassigned to other groups and managers, and Bio's manager position no longer existed. Koers and Benjamin tried to find a new management position for Bio using the redeployment tracker, but they could not find a position for him. With no new management position available for Bio and the specific Lilly work assigned to Bio's team completed, inVentiv terminated Bio's employment.

inVentiv asserts it is not the role of the Court to "question the wisdom of a company's decisions on how to run its business, only to assure that such decisions are not intended to provide cover for illegal discrimination." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946–47 (7th Cir. 2006). It is a legitimate, non-discriminatory reason for terminating an employee where "the company's business demands were growing and changing and [the employee's] former responsibilities were distributed among three other positions as part of an overall restructuring of job functions and reporting lines." *Id.*

13

inVentiv argues that Bio has no evidence that suggests Lilly's insourcing was a cover for discrimination. Lilly controlled the flow of work given to inVentiv, and when the specific work provided to Bio and his team was completed and not replaced, inVentiv could not sustain Bio's position. inVentiv contends that it tried to find a new manager position for Bio but was unsuccessful. inVentiv argues that Bio acknowledged in his deposition that there is no evidence of race or national origin discrimination and that he never witnessed such discrimination ([Filing No. 70-4 at 10](), 51, 59). Bio simply had his own unsupported hunch that decisions were motivated by race or national origin. inVentiv argues that "[s]imply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus." *Cole v. Bd. of Trs. Of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016).

Bio responds that in a mini-reduction-in-force ("mini-RIF") case, where the terminated employee's duties are absorbed by another employee or employees, courts use a modified fourth element of the *prima facie* case of discrimination—the employee's duties were absorbed by employees outside his protected class. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008). Thus, Bio argues, he does not need to identify similarly situated employees who received more favorable treatment because this is a mini-RIF case. Following his termination, his manager duties were absorbed by other managers—Benjamin and Bassile— who are Caucasian. inVentiv replies that the mini-RIF standard does not apply to Bio's claim because Bio's Lilly-dedicated team dissolved in July 2015 and no longer existed; therefore, no supervisor absorbed the substantive work Bio performed as the manager of the entire dissolved team. inVentiv notes that Bio's team was divided between two managers, Benjamin and Bassile, when Bio was terminated; Bassile supervised a team primarily responsible for operating as a direct liaison with Lilly, whereas

Bio's team performed programming work without communicating directly with Lilly; and the two programmers reassigned to Benjamin performed advanced analytic software testing, not the statistical analysis performed under Bio's supervision. inVentiv terminated Bio because it eliminated his manager position, and the substantive duties of that position no longer existed.

Viewing the evidence in the light most favorable to Bio as the non-moving party, as the Court must do at the summary judgment stage, *see Zerante*, 555 F.3d at 584, the Court finds this case does involve a mini-RIF situation where Bio was terminated as a manager, and his duties to manage a team of inVentiv employees were redistributed to other management level individuals. While Bio's team members' substantive work changed when they were reassigned to new teams and new managers, it is reasonable to infer that the newly-assigned managers performed similar management tasks that Bio had been performing as a manager. Thus, under the summary judgment standard, the Court determines that the evidence suggests Bio can show a *prima facie* case of discrimination in the mini-RIF context because his manager duties were redistributed to individuals who were not black and not from Niger. However, this does not end the Court's analysis. The Court must consider inVentiv's legitimate, non-discriminatory reason for terminating Bio and whether that reason was a pretext for discrimination.

inVentiv's proffered reason for terminating Bio is that Lilly insourced the statistical programming work that was assigned to Bio's team and did not replace that type of work. Thus, Bio and his team needed to be redeployed to other projects and teams, and there were no management positions for Bio to fill when his team's Lilly projects were completed. This is a legitimate, non-discriminatory reason for terminating Bio. Therefore, the Court considers the issue of pretext to determine whether Bio's claims can survive summary judgment.

15

Bio argues that inVentiv's proffered reason is a pretext for discrimination because it is simply false and has no basis in fact. Bio asserts that, while inVentiv claimed there was no more work for Bio and his team to perform by May or June 2015, the fact is there was plenty of work for them to perform. Bio argues that Lilly only insourced its oncology programming work, and there was additional Lilly work to perform at the time of his termination. In March 2014, Lilly had renewed its contract with inVentiv for three more years, and in June 2015, Bio and his team were working on Lilly projects with more Lilly projects coming on board in July 2015. Thus, Bio asserts, it is not true that there was no Lilly work for Bio's team by May 2015. Furthermore, Bio's team was busy working on Phase II–III projects in May and June 2015, so he had to turn away requests from other managers to help work on their projects. Bio and his team were working at full capacity, and there would be enough work to keep them working at full capacity well beyond his termination date. As of May 2015, Bio and his team were only devoting about 20% of their time to Lilly projects and about 80% of their time to non-Lilly projects. Bio further argues that the other managers working under Benjamin were devoted exclusively to Lilly projects, and none of the other managers were terminated. Bio asserts that, for all of these reasons, inVentiv's proffered reason for his termination was a pretext for unlawful discrimination.

Bio argues that inVentiv claimed there was no more Lilly work (or any other work) to perform when in fact there still was Lilly work (and other work) to perform. However, this is not precisely what inVentiv argued. inVentiv did not argue that all Lilly work was gone; rather, it asserted that the specific Lilly work for which Bio and his team were designated was gone. Bio's position as a manager, and the work of the team he managed, was dedicated to specific work governed by a contract with Lilly. That specific work eventually concluded. Bio's arguments and

evidence do not dispute these facts. It appears that Bio simply hoped that by keeping his team members busy on other managers' projects that he would be able to retain his job as a manager.

Furthermore, Bio's pretext argument ignores the evidence showing that inVentiv was organized into distinct groups including the strategic resourcing group, which served early-stage clinical research ventures, under which Bio's statistical programming team was organized. inVentiv's work projects were dictated by its clients' contracts and fell under one of inVentiv's distinct groups. The evidence shows that inVentiv had different work projects from Lilly (and other clients) that fell under different groups. However, this does not create a material dispute that the work for which Bio and his team were designated had come to a close.

The evidence shows that Bio knew well in advance of his termination that his team's work projects were going to dry up. He assisted in trying to keep his team members busy with other assignments from other managers. Benjamin reminded Bio that he needed to focus on permanent placements for his team members instead of keeping them busy with temporary work. His team members were dedicating almost all of their time to projects for clients and teams that Bio's team was not established or designed to serve. His team members no longer comprised one team of Lilly-dedicated statistical programmers working under one manager. With all his team members now working on projects for other managers, there was no longer a need for Bio's manager position to exist. During that time, inVentiv put Bio in its redeployment tracker in an effort to find a new position for him. However, when the specific work to which Bio's team was assigned was completed, no management positions were available for Bio.

Bio did not point to designated evidence that could support the position that race or national origin discrimination was a reason for his termination. Rather, Bio simply concluded, without citation or support, that "[t]he real reason for Bio's termination is his race and national origin."

17

([Filing No. 73 at 30](#).) "Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus." *Cole*, 838 F.3d at 900. Bio offered nothing more than the fact that he is a member of a protected class and his own speculative hunch of discrimination. This is not enough to defeat summary judgment.

Because inVentiv offered a legitimate, non-discriminatory reason for terminating Bio's employment and Bio failed to show that the reason was pretextual or based on his race or ethnicity, his Title VII and Section 1982 discrimination claims fail. Therefore, the Court **grants** summary judgment in favor of inVentiv on Bio's discrimination claims.

### IV. CONCLUSION

For the foregoing reasons, Defendant inVentiv Health Clinical, LLC's Motion for Summary Judgment ([Filing No. 68](#)) is **GRANTED**, and Plaintiff Maman Bio's claims are **dismissed**. Final judgment will issue under separate order.

**SO ORDERED.**

Date: 3/31/2019

*[signature]*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Amber K. Boyd
amber@amberboydlaw.com

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@stowersandweddle.com

Emily L. Connor
LITTLER MENDELSON, P.C.
econnor@littler.com

Alan L. McLaughlin
LITTLER MENDELSON, P.C.
amclaughlin@littler.com